UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | |
|---|---|
| EDWARD HUNTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AST SPACEMOBILE, INC., ABEL AVELLAN, and ANDREW M. JOHNSON,<br><br>Defendants. | Case No. 7:26-cv-378<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Edward Hunter ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AST SpaceMobile, Inc. ("AST" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired AST securities between

March 4, 2025 and July 15, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. AST, together with its subsidiaries, designs and develops the constellation of BlueBird ("BB") satellites in the U.S. The Company provides a cellular broadband network in space for direct access by smartphones for commercial use and other applications, as well as for government use. In addition, its SpaceMobile service provides cellular broadband services to end-users who are out of terrestrial cellular coverage.

3. At all relevant times, Defendants touted AST's purportedly unique competitive advantages and leadership position in the satellite direct-to-cellular ("D2C") market.[1] In particular, throughout the Class Period, Defendants touted AST's business and financial prospects as purportedly the only established space-based cellular broadband network for mobile phones.

4. Defendants' assurances regarding AST's purportedly durable competitive position in the satellite D2C market came into question in September 2025, when American telecommunications company EchoStar Corporation ("EchoStar") announced that it had entered into a definitive agreement with SpaceX, an American aerospace manufacturer and space transportation company, to sell its AWS-4 and H-block spectrum licenses (the "EchoStar Transaction").[2] In connection with the EchoStar Transaction, SpaceX and EchoStar agreed to

[1] Satellite D2C is an emerging technology that connects smartphones to low-Earth-orbit ("LEO") satellite networks, allowing users to connect to cellular service in areas where terrestrial (*i.e.*, ground-based) cellular networks are not available.

[2] Spectrum licenses are granted by national regulators, such as the U.S.'s Federal Communications Commission, providing structured, interference-free access to frequency bands, supporting everything from mobile data to satellite communication.

enter into a long-term commercial agreement, enabling EchoStar's Boost Mobile subscribers—through its cloud-native 5G core—to access SpaceX's next generation D2C service provided by its telecommunications subsidiary Starlink Services, LLC ("Starlink").

5. SpaceX commands a dominant position in the global aerospace and orbital launch industry, with the ability to produce and launch numerous satellites at scale. Its subsidiary Starlink provides a broadband internet satellite constellation that accounts for roughly 54% of all active satellites in Earth's orbit, with approximately 9,821 Starlink satellites currently active in LEO. Viewed in combination with its considerable resources, SpaceX's entry into the satellite D2C market was potentially a threat to AST's commercial aspirations.

6. Following the EchoStar Transaction, however, Defendants continued to assure investors and the market that AST remained in a competitive class of its own, with the Company poised to realize significant revenues and profits in the near-term. Likewise, Defendants continuously represented that AST's capital and liquidity position was sufficient to meet its strategic and business goals at all relevant times, notwithstanding the heightened competitive pressures it faced following the EchoStar Transaction.

7. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than Defendants had signaled to investors; (ii) accordingly, Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; (iii) Defendants likewise overstated the durability of AST's competitive position in the satellite D2C market; (iv) even following the EchoStar Transaction,

Defendants continued overstating AST's competitive position in the satellite D2C market; (v) AST was experiencing slow user adoption in the U.S. and Japan; (vi) the foregoing was likely to have a significant negative impact on the Company's business and financial prospects; and (vii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

8. The truth began to emerge on September 8, 2025, when UBS issued a report downgrading AST to a "Neutral" from "Buy" recommendation, as well as cutting its price target ("PT") on the Company to $43.00 from $62.00, mainly citing heightened competitive pressures related to the EchoStar Transaction, which "fortifies [Starlink's] position in the space to cellular market and increases risk for AST[] as it drives utilization on its nascent constellation[.]"

9. Following the release of UBS's report, AST's Class A common stock price fell $3.86 per share, or 9.47%, to close at $36.91 per share on September 9, 2025.

10. On October 21, 2025, AST issued a press release "announc[ing] its intent to offer . . . $850.0 million aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", and that it "intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150.0 million aggregate principal amount of Notes." The press release disclosed that AST would use the proceeds from this offering "for general corporate purposes, including without limitation ***funding the deployment of AST SpaceMobile's worldwide constellation of satellites in anticipation of adding incremental strategic markets for its SpaceMobile Service***."[3]

11. Later the same day, AST issued another press release "announc[ing] the pricing of $1.0 billion aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", noting that "[t]he size of the offering has been increased from the previously

[3] All emphases herein are added unless otherwise indicated.

announced $850.0 million principal amount of Notes", while reiterating the same intended use for the net proceeds from the offering.

12. Following these disclosures, AST's Class A common stock price fell $7.26 per share, or 9.24%, to close at $71.35 per share on October 22, 2025.

13. On January 6, 2026, Scotiabank issued a report downgrading AST to a "Sell" recommendation, as well as its rating to "Sector Underperform" from "Sector Perform", citing, *inter alia*, significant competition from Starlink and "[e]vidence of slow user adoption in the U.S. and Japan[.]"

14. Following the release of Scotiabank's report, AST's Class A common stock price fell $11.76 per share, or 12.06%, to close at $85.73 per share on January 7, 2026.

15. On February 11, 2026, AST issued a press release "announc[ing] its intent to offer . . . $1.0 billion aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", and that it "intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150.0 million aggregate principal amount of Notes." The press release disclosed that AST intended to use the proceeds from the offering "for general corporate purposes, including without limitation, ***accelerating the deployment of our controlled spectrum bands on a global basis, monetizing the capabilities of our proprietary technology to capture the evolving commercial opportunities related to artificial intelligence, enhancing investment in government space opportunities in the U.S., reducing higher interest debt, and pursuing opportunistic investments to accelerate our SpaceMobile Service and capabilities***."

16. The next day, AST issued another press release announcing the pricing of the foregoing offering at "an initial conversion price of approximately $116.30 per share of AST

SpaceMobile's Class A common stock, which represents a premium of approximately 20% to the last reported sale price of AST SpaceMobile's Class A common stock on February 11, 2026."

17. Following these disclosures, AST's Class A common stock price fell $14.70 per share, or 15.17%, to close at $82.22 per share on February 12, 2026.

18. Then, on July 15, 2026, AST issued a press release "announc[ing] its intent to offer" ***yet another*** "$1.0 billion aggregate principal amount of convertible senior notes due 2034 (the 'Notes') in a private offering", and that it "intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150 million aggregate principal amount of Notes." The press release disclosed that AST intended to use the proceeds from the offering to, *inter alia*, "***pursue an expanding universe of growth initiatives and secure additional access to orbit for its space-based cellular broadband network, including partnerships and/or acquisitions to further vertically integrate its business and mitigate risks associated with third-party launch providers***." The press release further disclosed that the Company "***currently does not have any understandings or agreements with respect to any such strategic transactions***."

19. Later the same day, AST issued another press release announcing the pricing of the foregoing offering. Specifically, "$1.0 billion 1.625% convertible senior notes due 2034 . . . [at] an initial conversion price of approximately $79.57 per share of AST SpaceMobile's Class A common stock, which represents a premium of approximately 20.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026", as well as "[c]apped call transactions . . . [at] an initial cap price of $149.20 per share of AST SpaceMobile's Class A common stock, which represents a premium of 125.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026."

20. Following the foregoing disclosures, AST's Class A common stock price fell $11.30 per share, or 17.04%, to close at $55.01 per share on July 16, 2026.

21. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). AST is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

25. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

26. Plaintiff, as set forth in the attached Certification, acquired AST securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27. Defendant AST is a Delaware corporation with principal executive offices located at Midland International Air & Space Port, 2901 Enterprise Lane, Midland, Texas 79706. The Company's Class A common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "ASTS".

28. Defendant Abel Avellan ("Avellan") is AST's Founder and has served as the Company's Chairman and Chief Executive Officer at all relevant times. During the Class Period, Defendant Avellan sold 55,244 shares of the Company's Class A common stock, enriching himself by over $5.5 million.

29. Defendant Andrew M. Johnson ("Johnson") has served as AST's Chief Financial Officer and Chief Legal Officer at all relevant times. During the Class Period, Defendant Johnson sold 190,131 shares of the Company's Class A common stock, enriching himself by over $13 million.

30. Defendants Avellan and Johnson are collectively referred to herein as the "Individual Defendants".

31. The Individual Defendants possessed the power and authority to control the contents of AST's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of AST's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with AST, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

32. AST and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

33. AST, together with its subsidiaries, designs and develops the constellation of BB satellites in the U.S. The Company provides a cellular broadband network in space for direct access by smartphones for commercial use and other applications, as well as for government use. In addition, its SpaceMobile service provides cellular broadband services to end-users who are out of terrestrial cellular coverage.

34. At all relevant times, Defendants touted AST's purportedly unique competitive advantages and leadership position in the satellite D2C market. In particular, throughout the Class Period, Defendants touted AST's business and financial prospects as purportedly the only established space-based cellular broadband network for mobile phones.

35. Defendants' assurances regarding AST's purportedly durable competitive position in the satellite D2C market came into question in September 2025, when EchoStar announced that it had entered into a definitive agreement with SpaceX to sell its AWS-4 and H-block spectrum licenses. In connection with the EchoStar Transaction, SpaceX and EchoStar agreed to enter into a long-term commercial agreement, enabling EchoStar's Boost Mobile subscribers—through its cloud-native 5G core—to access SpaceX's next generation Starlink D2C service.

36. SpaceX commands a dominant position in the global aerospace and orbital launch industry, with the ability to produce numerous satellites at scale. Its telecommunications

subsidiary Starlink provides a broadband internet satellite constellation that accounts for roughly 54% of all active satellites in Earth's orbit, with approximately 9,821 Starlink satellites currently active in LEO. Viewed in combination with its considerable resources, SpaceX's entry into the satellite D2C market was potentially a threat to AST's commercial aspirations.

37. Following the EchoStar Transaction, however, Defendants continued to assure investors and the market that AST remained in a competitive class of its own, with the Company poised to realize significant revenues and profits in the near-term. Likewise, Defendants continuously represented that AST's capital and liquidity position was sufficient to meet its strategic and business goals at all relevant times, notwithstanding the heightened competitive pressures it faced following the EchoStar Transaction.

**Materially False and Misleading Statements**

38. The Class Period begins on March 4, 2025. On March 3, 2025, during post-market hours, AST issued a press release providing a business update and fourth quarter ("Q4") and full year ("FY") 2024 results. The press release quoted Defendant Avellan as stating, in relevant part:

> [W]e enter 2025 ***even better positioned to lead the emerging direct-to-device satellite communications industry that we invented*** . . . . The many pieces of our plan are ***rapidly coming into place***. ***We advanced our customer ecosystem, formalized definitive commercial agreements, and expanded our U.S. Government capabilities.*** Finally, we completed a carefully structured financing transaction with minimal dilution to current shareholders, ***enabling us to accelerate our manufacturing efforts and start 2025 stronger than ever***.[]
>
> []***With nearly $1.0 billion in cash on our balance sheet*** pro forma for the recent offering of convertible notes, ***an alliance of industry leading partners, and our proprietary technology, we are well-positioned for continued success*** . . . . We are laser-focused on building and deploying satellites and expanding our commercial agreements during 2025, moving toward commercial-scale revenues. Our vision has never been clearer, and we believe ***we have the resources and capabilities to execute our plans***.

39. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, "**[s]ignificant advancement in commercialization of SpaceMobile network with new commercial agreements with Vodafone and the U.S. Government**", "**full operational status for first five BlueBird commercial satellites, each the largest-ever commercial communications arrays deployed in low Earth orbit**", "**[a]ccelerated satellite manufacturing**", an "**agreement for long-term access to up to 45 MHz of premium lower mid-band spectrum in the U.S. for direct-to-device applications**", and a "**[r]obust balance sheet with nearly $1.0 billion in cash, cash equivalents, and restricted cash (as of December 31, 2024), pro forma for convertible notes offering**[.]" (Emphases in original.)

40. Also on March 3, 2025, during post-market hours, AST filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K touted various competitive advantages AST purportedly enjoyed, including a "***Large Addressable Market***", "***Delivery of Cellular Broadband Coverage at a Competitive Cost***", "***Definitive Commercial Agreements with MNOs [Mobile Network Operators] Enabling Access to Key Markets and Potentially Large Number of Subscribers***", "***Cellular Broadband Directly to Unmodified Devices***", "***Satellites Designed for Great Functionality, Power and Redundancy***", "***Cost Advantages due to Greater Control of our Manufacturing***", and the "***Capability to Support Both Commercial and Government Applications on the Same Satellite or on a Singular Infrastructure***[.]" (Emphases in original.)

41. The 2024 10-K also stated that "[w]e believe our cash and cash equivalents on hand and our ability to raise capital through access to the 2024 ATM Equity Program ***will be sufficient***

***to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Annual Report.***"

42. Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

43. On May 12, 2025, AST issued a press release providing a business update and first quarter ("Q1") 2025 results. The press release quoted Defendant Avellan as touting, *inter alia*, AST's "expanded . . . U.S. Government opportunity and . . . position to start generating meaningful revenue during 2025."

44. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, a "**multi-provider satellite orbital launch plan with five contracted launches over the next six to nine months**", "**[a]dvanced SpaceMobile network commercialization efforts, with expected second half 2025 revenue opportunity of $50.0 million to $75.0 million**", "**strong progress on regulatory approvals and spectrum-related topics with partners and key industry groups**", and a "**[r]obust balance sheet with $874.5 million in cash, cash equivalents, and restricted cash as of March 31, 2025, with continued access to diverse capital markets**[.]" (Emphases in original.)

45. Also on May 12, 2025, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q1 ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q stated, *inter alia*, that "[w]e believe our existing cash and cash equivalents on hand ***will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report***."

46. Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 42, *supra*, signed by the Individual Defendants.

47. On August 11, 2025, AST issued a press release providing a business update and second quarter ("Q2") 2025 results. The press release quoted Defendant Avellan as stating, in relevant part, that "we now have a path for premium spectrum on a global basis, ***which is uniquely valuable with our innovative technology*** backed by over 3,700 patent and patent pending claims to support up to 120 Mbps peak data rates per cell globally."

48. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, "**[p]repar[ations] to deploy nationwide intermittent service in the United States by the end of 2025, followed by the United Kingdom, Japan, and Canada in Q1 2026**", an "**[e]xpanded spectrum strategy with agreement to acquire 60 MHz of global S-Band spectrum priority rights, augmenting existing 3GPP cellular spectrum strategy and strengthening position within wireless ecosystem**", "**[a]dvanced commercialization efforts with expansion of partnerships, derived from agreements with more than 50 mobile network operators globally, which have nearly 3.0 billion existing subscribers, while receiving additional U.S. Government contract awards**", and "**[o]ver $1.5 billion in balance sheet cash, cash equivalents, and restricted cash (as of June**

**30, 2025), pro forma for convertible notes offering and sales under the now terminated ATM facility**[.]"

49. Also on August 11, 2025, AST hosted a conference call with investors and analysts to discuss its Q2 2025 results. During the call, an analyst asked, "given the current launch cadence and near-term goals, is your current funding runway sufficient to reach initial commercial revenue or do you foresee additional capital needs?" Defendant Johnson responded, in relevant part, that "[g]iven our pro forma balance sheet at the end of Q2 of over $1.5 billion, we do believe that ***we are fully funded now*** to reach the 45 to 60 satellite level and as part of that, ***our capital strategy going forward will be one focused not on threshold business delivery needs***[.]"

50. The same day, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q stated, *inter alia*, that "[w]e believe our existing cash and cash equivalents on hand ***will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report***."

51. Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 42, *supra*, signed by the Individual Defendants.

52. The statements referenced in ¶¶ 38-51 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than Defendants had signaled to investors; (ii) accordingly,

Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; (iii) Defendants likewise overstated the durability of AST's competitive position in the satellite D2C market; (iv) AST was experiencing slow user adoption in the U.S. and Japan; (v) the foregoing was likely to have a significant negative impact on the Company's business and financial prospects; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

53. The truth began to emerge on September 8, 2025, when UBS issued a report during post-market hours downgrading AST to a "Neutral" from "Buy" recommendation, as well as cutting its PT on the Company to $43.00 from $62.00. The UBS report mostly cited heightened competitive pressures from Starlink following the EchoStar Transaction, which was announced earlier the same day, stating, *inter alia*:

> **Starlink (AST's primary competitor) enhances positioning with spectrum deal**
> We are downgrading ASTS to Neutral from Buy and lowering our PT to $43 ($62 prior) . . . . [W]e believe Starlink's newly announced acquisition of Echostar's S-Band spectrum for $19B fortifies its position in the space to cellular market and increases risk for ASTS as it drives utilization on its nascent constellation. We . . . now see a more balanced risk-reward with competitive concerns likely to persist. We are lowering our LT [long-term] utilization assumptions and now look for $383M of revenue/$82M of EBITDA in 2026 (unch.), scaling to $3.0B/2.4B in 2030 (vs. $3.6B/$2.9B prior and Factset consensus $3.7B/2.7B).
>
> **Still see room for multiple players in space to cellular but execution risk higher**
> While we still believe the market opportunity will support multiple players LT, we believe the newly announced spectrum deal between Echostar and Starlink enhances the positioning of ASTS' primary competitor and creates added execution risk. Starlink began targeting space to cellular service with new satellites in recent years, but we believe the spectrum transaction 1) signals Starlink's commitment to scaling in this market with a full broadband/voice solution leveraging multiple spectrum bands and 2) enhances its standing with more spectrum rights to pair with its launch capabilities. While certain direct to device carrier deals have exclusive elements initially, carriers could also increasingly explore working with multiple providers in time.

> **Lowering utilization assumptions and estimates**
> AST is targeting 5 launches by 1Q26 with 45-60 Block 2 satellites deployed by YE26, enabling continuous coverage in target markets. Our prior 2030 base case ($3.6B of rev) aligned with ~35% capacity utilization but we now look for $3.0B of rev/30% utilization given greater competition. This assumes a more gradual ramp in both carrier/gov't revenues (UBSe $2.3B/$700M in 2030 vs. $2.8B/$800M prior), flowing through at high margin given high fixed costs.
>
> **Valuation: Lowering price target; downgrade to Neutral**
> We are lowering our PT to $43, based on 10x 2030E EBITDA (in-line with multi-yr avg for public satellite comps) discounted back at 14%. Our prior PT was based on 12x 2030E EBITDA (discounted at 14%) or at the high-end of the peer avg historically but we believe a lower multiple is justified given increased competitive concerns.

(Emphases in original.)

54. Following the release of UBS's report, AST's Class A common stock price fell $3.86 per share, or 9.47%, to close at $36.91 per share on September 9, 2025.

55. Then, on October 21, 2025, during post-market hours, AST issued a press release "announc[ing] its intent to offer . . . $850.0 million aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", and that it "also intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150.0 million aggregate principal amount of Notes." The press release disclosed that AST intended to use the net proceeds from this offering "for general corporate purposes, including without limitation ***funding the deployment of AST SpaceMobile's worldwide constellation of satellites in anticipation of adding incremental strategic markets for its SpaceMobile Service***."

56. The same day, also during post-market hours, AST issued another press release "announc[ing] the pricing of $1.0 billion aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", noting that "[t]he size of the offering has been increased from the previously announced $850.0 million principal amount of Notes", while reiterating the same intended use for the net proceeds from the offering.

57. Following these disclosures, AST's Class A common stock price fell $7.26 per share, or 9.24%, to close at $71.35 per share on October 22, 2025.

58. Despite the aforementioned declines in the Company's stock price, AST securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, AST's competitive position in the satellite D2C market, the sufficiency of its capital and liquidity position to achieve its strategic and business goals, and the overall pace of its user adoption.

59. For example, on November 10, 2025, AST issued a press release providing a business update and third quarter ("Q3") 2025 results. The press release quoted Defendant Avellan as stating, *inter alia*, that the Company "***continues to lead the direct-to-device space-based cellular broadband industry***," and that, "[d]uring the past few months, ***commercial activity has significantly accelerated, demonstrating the robust demand for our solution across the ecosystem***."

60. The press release also touted various purported improvements to AST's commercial and financial position, including "**[s]ignificant contract wins with the signing of definitive commercial agreements with stc Group and Verizon, as well as additional traction with U.S. Government customer**", "**over $1.0 billion in aggregate contracted revenue commitments from partners as commercialization efforts and integration with partner networks accelerate**", the start of a "**multi-provider orbital launch campaign following shipment of BlueBird 6 to India with launch expected in first half of December**", and a "**[r]obust balance sheet with over $3.2 billion in cash, cash equivalents, restricted cash and liquidity, pro forma for convertible notes offering, monetized capped call, and aggregate**

**proceeds and availability under the ATM facility (as of September 30, 2025)**[.]" (Emphases in original.)

61. Also on November 10, 2025, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q3 ended September 30, 2025 (the "Q3 2025 10-Q"). The Q3 2025 10-Q stated, *inter alia*, that "[w]e believe our existing cash and cash equivalents on hand ***will be sufficient to meet our anticipated cash requirements, including current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report***."

62. Appended as exhibits to the Q3 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 42, *supra*, signed by the Individual Defendants.

63. The statements referenced in ¶¶ 59-62 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than Defendants had signaled to investors; (ii) accordingly, Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; (iii) even following the EchoStar Transaction, Defendants continued overstating AST's competitive position in the satellite D2C market; (iv) AST was experiencing slow user adoption in the U.S. and Japan; (v) the foregoing was likely to have a significant negative impact on the Company's business and financial prospects; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

64. On January 6, 2026, Scotiabank issued a report during post-market hours downgrading AST to a "Sell" recommendation, as well as its rating to "Sector Underperform" from "Sector Perform", citing, *inter alia*, significant competition from Starlink and slow customer adoption in the U.S. and Japan. Specifically, the Scotiabank report stated, *inter alia*:

> **OUR TAKE: Negative.** Without yet a single retail customer and faced by the challenge of orbiting ~50 satellites to hit continuous service in a handful of markets in late 2026 or early 2027, ASTS's share price at US$97.60/share has once again overshoot [*sic*] to what we see as irrational levels (market cap of US$37B). Evidence of slow user adoption in the U.S. and Japan, modest ARPUs and high capex (including duplicated satellites for new frequencies) means investors may have to wait until 2028 or 2029 for tangible EFCF generation. Meanwhile, Starlink's accelerated fixed growth and global brand recognition means ASTS competes with a leader that already has, in terms of revenues, the equivalent of 340 million global DTC users (~680 million by the time ASTS launches in select markets). While it has been an ordeal for ASTS to launch seven satellites since 2017, in 2025 alone Starlink orbited 3,169 units . . . . [W]e . . . disagree with those dismissing ASTS's multi-year delays and Starlink's unstoppable growth. The middle-ground scenario points to a valuation range between US$45/share and US$55/share. **Sell.**
>
> * * *
>
> **We Believe ASTS Is Fairly Valued at Levels Closer to US$45-US$55 Per Share**
>
> The ASTS commercial launch in the U.S. may have to wait until early 2027, while carriers overseas may have to wait until 2028 or 2029. Our US$45.60/share target is based on EFCF of US$3.5B for 2028, supported by 225M paid subs under a global average ARPU of US$2.92/sub, not a conservative projection.
>
> Of note, in its 2025 report, Starlink reported 6M monthly users to its DTC [*i.e.*, D2C] services despite the company covering over 400M people (soon to expand to 1B with new markets such as Kazakhstan, Mexico, Mongolia, Peru, Switzerland, UK, Ukraine and Zambia). The service is already available in Australia, Canada, Chile, Japan, New Zealand and the United States. Projecting ASTS to have 225M paid subs by 2028 seems on the bullish side, especially if major carriers such as América Móvil decide to partner with Starlink (which is why we are following the Telcel move so closely).
>
> While TMUS [T-Mobile] did not provide specific numbers on DTC subscribers at the Q3/25 earnings release, early figures by KDDI in Japan suggest only 6% of the wireless base subscribed to the new service (it was launched earlier last year). Japan, however, is a highly penetrated market with impressive tower density (KDDI

> operates more towers than Vivo or TIMB in Brazil, a country with 21x Japan's landmass); we believe the DTC opportunity in other territories such as the Americas should be greater. But the point is that 225M paid subscribers by 2028 looks more on the aggressive side, and that current valuation at US$97.56/share is hard to back under rational EFCF projections.

(Emphases in original.)

65. Following the release of Scotiabank's report, AST's Class A common stock price fell $11.76 per share, or 12.06%, to close at $85.73 per share on January 7, 2026.

66. Then, on February 11, 2026, during post-market hours, AST issued a press release "announc[ing] its intent to offer . . . $1.0 billion aggregate principal amount of convertible senior notes due 2036 (the 'Notes') in a private offering", and that it "also intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150.0 million aggregate principal amount of Notes." The press release disclosed that the Company intended to use the net proceeds from the offering "for general corporate purposes, including without limitation, ***accelerating the deployment of our controlled spectrum bands on a global basis, monetizing the capabilities of our proprietary technology to capture the evolving commercial opportunities related to artificial intelligence, enhancing investment in government space opportunities in the U.S., reducing higher interest debt, and pursuing opportunistic investments to accelerate our SpaceMobile Service and capabilities***."

67. The next day, during pre-market hours, AST issued another press release announcing the pricing of the foregoing notes offering at "an initial conversion price of approximately $116.30 per share of AST SpaceMobile's Class A common stock, which represents a premium of approximately 20% to the last reported sale price of AST SpaceMobile's Class A common stock on February 11, 2026."

68. Following these disclosures, AST's Class A common stock price fell $14.70 per share, or 15.17%, to close at $82.22 per share on February 12, 2026.

69. Despite the aforementioned declines in the Company's stock price, AST securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals.

70. For example, on March 2, 2026, AST issued a press release providing a business update and Q4 and FY 2025 results. The press release quoted Defendant Avellan as stating, in relevant part, that "AST . . . ***significantly advanced all key aspects of our operations including commercial, government, manufacturing, spectrum rights, IP portfolio, and capital position***[.]"

71. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, "**revenue of $70.9 million for the full year 2025, driven by mobile network operator partners and the U.S. Government**", and its "**[r]obust balance sheet with over $3.9 billion in cash, cash equivalents, restricted cash and liquidity, pro forma for the convertible notes offering and availability under the ATM facility (as of December 31, 2025)**[.]" (Emphases in original.)

72. Also on March 2, 2026, AST filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for its Q4 and FY ended December 31, 2025 (the "2025 10-K"). The 2025 10-K contained the same statements as referenced in in ¶ 40, *supra*, regarding the competitive advantages AST purportedly enjoyed.

73. The 2025 10-K also stated, *inter alia*, that "[w]e believe our cash and cash equivalents on hand ***will be sufficient to meet our current working capital needs, planned***

***operating expenses and capital expenditures for a period of the next 12 months from the date of this Annual Report***."

74. Appended as exhibits to the 2025 10-K were substantively the same SOX certifications as referenced in ¶ 42, *supra*, signed by the Individual Defendants.

75. On May 11, 2026, AST issued a press release providing a business update and Q1 2026 results. The press release quoted Defendant Avellan as stating, in relevant part:

> AST SpaceMobile is accelerating manufacturing, regulatory progress, commercial partnerships, and government programs, ***furthering our position as the only technology positioned to capture the massive direct to device broadband opportunity in full***[.]
>
> * * *
>
> ***We have a robust global spectrum portfolio, the industry's largest global commercial ecosystem, and a fortress balance sheet, positioning us for success as we create the space-based cellular broadband market.***

76. The press release also touted various purported improvements to AST's commercial and financial position, including, *inter alia*, its "**key assets – intellectual property, partnerships, balance sheet cash, access to shared MNO and MSS spectrum, over 500,000 square feet of manufacturing and operations space globally – to build and launch over 100 BlueBird satellites**[.]" (Emphases in original.)

77. Also on May 11, 2026, AST filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for its Q1 ended March 31, 2026 (the "Q1 2026 10-Q"). The Q1 2026 10-Q stated, *inter alia*, that "[w]e believe our cash and cash equivalents on hand ***will be sufficient to meet our current working capital needs, planned operating expenses and capital expenditures for a period of the next 12 months from the date of this Quarterly Report***."

78. Appended as exhibits to the Q1 2026 10-Q were substantively the same SOX certifications as referenced in ¶ 42, *supra*, signed by the Individual Defendants.

79. The statements referenced in ¶¶ 70-78 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) AST's increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than Defendants had signaled to investors; (ii) accordingly, Defendants had overstated the sufficiency of AST's capital and liquidity position to achieve its strategic and business goals; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

80. On July 15, 2026, AST issued a press release during post-market hours "announc[ing] its intent to offer" ***yet another*** "$1.0 billion aggregate principal amount of convertible senior notes due 2034 (the 'Notes') in a private offering", and that it "intends to grant the initial purchasers of the Notes . . . an option to purchase . . . up to an additional $150 million aggregate principal amount of Notes." The press release disclosed that AST intended to use the proceeds from the offering to, *inter alia*, "***pursue an expanding universe of growth initiatives and secure additional access to orbit for its space-based cellular broadband network, including partnerships and/or acquisitions to further vertically integrate its business and mitigate risks associated with third-party launch providers***." The press release further disclosed that the Company "***currently does not have any understandings or agreements with respect to any such strategic transactions***."

81. Later the same day, AST issued another press release announcing the pricing of the foregoing offering. Specifically, "$1.0 billion 1.625% convertible senior notes due 2034 . . . [at] an initial conversion price of approximately $79.57 per share of AST SpaceMobile's Class A common stock, which represents a premium of approximately 20.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026", as well as "[c]apped call transactions . . . [at] an initial cap price of $149.20 per share of AST SpaceMobile's Class A common stock, which represents a premium of 125.0% over the last reported sale price of AST SpaceMobile's Class A common stock on July 15, 2026."

82. Following these disclosures, AST's Class A common stock price fell $11.30 per share, or 17.04%, to close at $55.01 per share on July 16, 2026. In addition, market analysts issued reports addressing these disclosures shortly afterwards, expressing, *inter alia*, caution with respect to the Company's business moving forward.

83. For example, also on July 16, 2026, UBS issued a report noting that "[t]he language [in the recent notes offering announcement] suggests a more vertically integrated business going forward, ***but visibility is limited and the company noted there are no agreements for strategic transactions in place***." The UBS report further stated that while "[w]e believe AST will likely secure additional capacity with new launch providers following the Blue Origin test explosion in May," this would "***potentially driv[e] up the $21-23M capital cost per satellite in the short term***."

84. Similarly, on July 20, 2026, Roth Capital Partners ("Roth") issued a report addressing AST, observing that "[i]n Thursday's aftermath of a $1.1B convert, ASTS came under pressure (-17% Thursday vs. SPX down <1%) as investors wrestled with 'Why,' given the fully funded D2D [direct-to-device] constellation." In particular, the Roth report noted that, "[t]his past

week, ***the announcement of a $1.1B convert placed significant pressure on ASTS shares, as the action appeared to conflict with prior comments of the constellation being fully funded***."

85. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Regulation S-K Item 303**

86. Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required AST to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants failed to disclose, *inter alia*, that AST's competitive position in the satellite D2C market was not as strong or durable as Defendants had led investors to believe, that it was experiencing slow user adoption in the U.S. and Japan, and that its increasing capital requirements were likely to increase the Company's debt load and share dilution with greater frequency and at greater scale than Defendants had signaled to investors. Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**SCIENTER ALLEGATIONS**

87. During the Class Period, Defendants had both the motive and opportunity to commit fraud. For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for AST's securities, Defendant Avellan enriched himself by over $5.5 million by selling 55,244 shares of the

Company's Class A common stock, whereas Defendant Johnson enriched himself by over $13 million by selling 190,131 shares of the Company's Class A common stock.

88. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. AST's competitive position in the satellite D2C market was of prime importance to investors and the market throughout the Class Period, and its purported leadership in that market formed a core part of the Company's overall investment thesis. Accordingly, Defendants were undoubtedly highly focused on the Company's competitive position in the satellite D2C market at all relevant times, including competitive pressures from Starlink following the EchoStar Transaction. Defendants were likewise thus undoubtedly laser-focused on the funds that they were likely to expend to bolster AST's competitive position in the market and realize its strategic and business ambitions, including by raising such funds through frequent convertible senior notes (*i.e.*, debt) offerings. Yet, as detailed herein, Defendants consistently and repeatedly touted the purported strength of AST's competitive and financial position throughout the Class Period, including the purported sufficiency of its cash and cash equivalents "on hand", while dumping tens-of-thousands of shares of the Company's Class A common stock for millions of dollars in profits. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

89. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AST securities during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

90. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AST securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AST or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

91. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

92. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

93. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AST;
- whether the Individual Defendants caused AST to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of AST securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

94. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

95. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- AST securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold AST securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

96. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

97. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

98. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

99. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

100. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AST securities; and (iii)

cause Plaintiff and other members of the Class to purchase or otherwise acquire AST securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

101. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for AST securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about AST's finances and business prospects.

102. By virtue of their positions at AST, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

103. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of AST, the Individual Defendants had knowledge of the details of AST's internal affairs.

104. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of AST. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to AST's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of AST securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning AST's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired AST securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

105. During the Class Period, AST securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of AST securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of AST securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of AST securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

106. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

107. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

108. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

109. During the Class Period, the Individual Defendants participated in the operation and management of AST, and conducted and participated, directly and indirectly, in the conduct of AST's business affairs. Because of their senior positions, they knew the adverse non-public information about AST's competitive position in the satellite D2C market, the actual sufficiency of its capital and liquidity position, and false financial statements.

110. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AST's financial condition and results of operations, and to correct promptly any public statements issued by AST which had become materially false or misleading.

111. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which AST disseminated in the marketplace during the Class Period concerning AST's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause AST to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of AST within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AST securities.

112. Each of the Individual Defendants, therefore, acted as a controlling person of AST. By reason of their senior management positions and/or being directors of AST, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, AST to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of AST and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

113. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AST.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 14, 2026

Respectfully submitted,

*/s/ Willie C. Briscoe*
WILLIE C. BRISCOE
State Bar Number 24001788
**THE BRISCOE LAW FIRM, PLLC**
5473 Blair Road, Suite 200
Dallas, Texas 75231
Telephone: 972-521-6868
Facsimile: 346-214-7463
wbriscoe@thebriscoelawfirm.com

**POMERANTZ LLP**
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

**Pro hac vice* applications forthcoming